**E-FILED**
Friday, 13 July, 2007  03:52:00 PM
Clerk, U.S. District Court, ILCD

IN THE UNITED STATES DISTRICT COURT
FOR THE CENTRAL DISTRICT OF ILLINOIS
URBANA DIVISION

| | | |
|---|---|---|
| SHAWN ROBINSON, #B33802, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| -vs- | ) | No. 05-2251 |
| | ) | |
| WARDEN CHAMBERS, | ) | |
| OFFICER D. ATWOOD, | ) | |
| OFFICER CUNNINGHAM, | ) | |
| | ) | |
| Defendants. | ) | |

## STATEMENT OF MATERIAL
## FACTS CLAIMED TO BE UNDISPUTED

NOW COMES the Defendant, CHRIS CUNNINGHAM, by and through his attorney, Lisa Madigan, Attorney General for the State of Illinois, and hereby submits his statement of material facts claimed to be undisputed in support of his motion for summary judgment.

1.      The incident at issue in this case took place on July 10, 2005 on the 3 - 11 shift.  (Plaintiff's Deposition, p. 7, l. 17 - p. 8, l. 7; Cunningham Affidavit).

2.      When Plaintiff reported to work in the R4 housing unit, Defendant Cunningham asked Plaintiff twice if he had anything unrelated to his job assignment. (Plaintiff's Dep., p. 8, l. 9 - p. 9, l. 3 13; Cunningham Affidavit).

3.      After the second time Defendant Cunningham asked the question, Plaintiff said, "no, you can shake me down if you want to."  (Plaintiff's Dep., p. 8, l. 24 - p. 9, l. 3; Cunningham Affidavit).

1

4.     Plaintiff was ordered by Defendant Cunningham to get up against the glass and put his hands on the glass.  (Plaintiff's Dep., p. 9, l. 5 - 9; Cunningham Affidavit).

5.     Plaintiff alleges he did not comply with the order.  (Plaintiff's Dep., p. 9, l. 8 - 15).

6.     Plaintiff alleges he was pushed against the glass.  (Plaintiff's Dep., p. 9, l. 16 - 17).

7.     Plaintiff alleges his left little finger and right elbow were hurt when he tried to catch himself to keep his balance against the glass.  (Plaintiff's Dep., p. 9, l. 19 - 24).

8.     Defendant Cunningham only placed one hand on Plaintiff's shoulder and then patted him down.  (Cunningham Affidavit; Plaintiff's Dep., p. 11, l. 4 - 8).

9.     Plaintiff does not remember if Defendant Cunningham "pushed" him with one or two hands.  (Plaintiff's Dep., p. 10,  19 - 22).

10.     Plaintiff was standing approximately 1 1/2 feet from the glass wall when he  alleges he was pushed into the glass.  (Plaintiff's Dep., p. 10, l. 23 - p. 11, l. 3).

11.     Plaintiff did not say anything to Defendant Cunningham after he alleges he was pushed against the glass by Defendant Cunningham.  (Plaintiff's Dep., p. 11, l. 9 - 19).

12.     Plaintiff did not complain to Defendant Cunningham about any injury. (Cunningham Affidavit).

13.     Plaintiff alleges he did not put in a request to see someone in the Health Care Unit until two days after the incident.  (Plaintiff's Dep., p. 15, l. 19 - p. 16, l. 2).

2

14.     Plaintiff admits his elbow was only bruised, but alleges his finger was dislocated.  (Plaintiff's Dep., p. 16, l. 3 - 21).

15.     Plaintiff had no problems with Defendant Cunningham prior to this incident.  (Plaintiff's Dep., p. 17, l. 14 - 20).

16.     Plaintiff does not know why he did not ask to be seen in the Health Care Unit until two days after the incident.  (Plaintiff's Dep., p. 18, l. 9 - 14).

17.     Plaintiff admits he did not put in the sick call slip that his finger was dislocated.  (Plaintiff's Dep., p. 18, l. 15 - p. 19, l. 2).

18.     Plaintiff believes that Cunningham and "everybody" was after him because he reported C/O Atwood.  (Plaintiff's Dep., p. 20, l. 5 - 6).

19.     Defendant Cunningham was not present when Plaintiff reported C/O Atwood. (Plaintiff's Dep., p. 20, l. 10 - 11).

20.     Plaintiff believes Defendant Cunningham assaulted him because he was friends with C/O Atwood.  (Plaintiff's Dep., p. 20, l. 21 - 24).

21.     Plaintiff does not know whether Defendant Cunningham knew he had reported C/O Atwood.  (Plaintiff's Dep., p. 21 - l. 1 - 5).

22.     Plaintiff had previously brought non-work items to his work assignment. (Plaintiff's Dep., p. 8, l. 14 - 18).

23.     Plaintiff alleges he asked Correctional Officer Thompson who was in the control unit for call the Health Care Unit.  (Plaintiff's Dep., p. 13, l. 16 - p. 14, l. 7).

24.     The Health Care Unit personnel would not let him be seen that night. (Plaintiff's Dep., p. 13, l. 22 - p. 14, l. 7).

3

25.     Plaintiff does not know why he alleges he did not put in a sick call request until two days after the incident.  (Plaintiff's Dep., p. 18, l. 9 - 14).

26.     In his alleged sick call request, Plaintiff just said he "wanted to see the nurse about [his] hand."  (Plaintiff's Dep., p. 18, l. 15 - p. 19, l. 5).

Respectfully submitted,

CHRIS CUNNINGHAM,

Defendant,

LISA MADIGAN, Attorney General,
State of Illinois

By:   s/ Kelly R. Choate
Kelly R. Choate, #6269533
Assistant Attorney General
Attorney for Defendant
500 South Second Street
Springfield, Illinois  62706
Telephone:  (217) 782-9026
Facsimile:   (217) 524-5091
E-Mail:  kchoate@atg.state.il.us

4

IN THE UNITED STATES DISTRICT COURT
FOR THE CENTRAL DISTRICT OF ILLINOIS
URBANA DIVISION

SHAWN ROBINSON, #B33802,           )
                                    )
              Plaintiff,            )
                                    )
     -vs-                           )          No. 05-2251
                                    )
WARDEN CHAMBERS,                    )
OFFICER D. ATWOOD,                  )
OFFICER CUNNINGHAM,                 )
                                    )
              Defendants.           )

**CERTIFICATE OF SERVICE**

I hereby certify that on July 13, 2007, I electronically filed a Statement of Material Facts Claimed to Be Undisputed with the Clerk of the Court using the CM/ECF system which will send notification of such filing(s) to the following:

None

and I hereby certify that on July 13, 2007, I mailed by United States Postal Service, the document(s) to the following non-registered participant(s):

Shawn Robinson, #B33802
Big Muddy Correctional Center
251 North Illinois Highway 37
Post Office Box 900
Ina, Illinois  62846-1000

Respectfully Submitted,
 s/ Kelly R. Choate
Kelly R. Choate, #6269533
Assistant Attorney General
Attorney for Defendant
500 South Second Street
Springfield, Illinois  62706
Telephone:  (217) 782-9026
Facsimile:   (217) 524-5091
E-Mail:  kchoate@atg.state.il.us

STATE OF ILLINOIS          )
                           )
COUNTY OF VERMILLION       )


**A F F I D A V I T**


    I, CHRIS CUNNINGHAM, being first duly sworn under oath, state that I have personal knowledge of the facts set forth herein, that I am competent to testify and if called to testify would state as follows:

1.    I am currently employed by the Illinois Department of Corrections as a Correctional Officer at Danville Correctional Center. I have held this position for six and one-half years.

2.    At the time alleged in this case, I was employed as a Correctional Officer, assigned to the R4 housing unit.

3.    I am familiar with the plaintiff in this case, Shawn Robinson, from when he was incarcerated at Danville Correctional Center. Mr. Robinson was on a work crew that cleaned the R4 housing unit.

4.    During the times alleged in this case, summer of 2005, we had been having a problem with inmate workers from other housing units bringing contraband into R4 to sell or trade with the inmates housed in R4.

5.    At that time, it was routine to search the incoming workers to ascertain whether they were carrying any items that were not allowed.

6.    On July 10, 2005 at approximately 10:00 p.m., Mr. Robinson was entering the R4 housing unit on the way to his job assignment. I asked him if he had any non-work related items with him and he replied, "Shake me down if you want to." I asked him, again, if he had any non-work related items, and he stated, "I ain't got nothing, but you can shake me down if you want to."

7.    I ordered him to turn around. I placed on hand on his shoulder and ordered him to lean against the glass wall of the housing unit so he could be searched. He complied with my order, and I proceeded to pat him down.

8.    I wrote Mr. Robinson a disciplinary ticket for insolence. A copy of the

ticket is attached to this affidavit. I inadvertently dated the disciplinary ticket for July 11, 2005; however, the incident took place on July 10, 2005, and was turned given to my supervisor on July 10, 2005.

9.     At no time did I push or shove Mr. Robinson against the glass, and while Mr. Robinson complained at the time that I pushed him, he did not complain of any injury, nor was there any injury apparent.

10.    I also have never shaken down, harmed, or otherwise retaliated against an inmate because he complained about another officer, and I did not shake down Mr. Robinson because he had complained about an officer.

11.    I did not receive any discipline as a result of Mr. Robinson's allegations.


FURTHER AFFIANT SAYETH NOT.

CHRIS CUNNINGHAM

SUBSCRIBED and SWORN TO
before me this 12th day
of July, 2007.

NOTARY PUBLIC

"OFFICIAL SEAL"
JUDY K. WYATT
Notary Public, State of Illinois
My Commission Expires 3/22/11

11C28

State of Illinois -- Department of Corrections
**DISCIPLINARY REPORT**

Page _1_ of _1_

☑ Disciplinary Report _2-11-05_
Date

☐ Confinement Pending Issuance of Disciplinary Report _____
Date

☐ Investigative Report _____
Date

Committed Person: _Robinson_    No. _B33802_    Facility: _Danville_

Observation Date: _2-11-05_    Time: _App. 10:00_ am/pm    Location: _P4 HU_

_C/O Pruchnickson Lester_
PRINT Employee's Name

_C/O Lester / 10:45am / 3-11_
Employee's Signature/Time/Shift

Offense: 504 _304 Insolence_

Observation: _On the above date and approx. time I/m Robinson (B33802) entered the P4 Housing Unit and this C/O asked him if he had any non-work related material in his possession. I/m Robinson stated "Shake me down if you want to." This C/O again asked if he had anything and I/m Robinson stated "No I ain't got nothing, but you can Shake me down if you want to." This C/O had I/m Robinson turn around and proceeded to Shake him down. Lt. Brown notified. I/m identified by institutional ID._

Witnesses, if any: _C/O Hurt, C/O Thompson_

NOTE: Use additional pages if necessary to describe observation and/or list witnesses.

☐ Temporary Confinement    ☐ Investigative Status    Reasons: _____

_____
PRINT Name

_____
Shift Supervisor's Signature and Date
(For Community Correctional Centers, Chief Adm. Off.)

☐ MAJOR, submitted to Adjustment Committee    ☒ MINOR, submitted to Program Unit

_L + Linville_
PRINT Name

_____ _7/10/05_
Reviewing Officer's Signature and Date

☐ Reviewed by Hearing Investigator: _____
(Adult Division Major Reports Only)    PRINT Name

_____
Signature and Date

### PROCEDURES APPLICABLE TO ALL HEARINGS ON INVESTIGATIVE AND DISCIPLINARY REPORTS

You have the right to appear and present a written or oral statement or explanation concerning the charges. You may present relevant physical material such as records or documents.

### PROCEDURES APPLICABLE TO HEARINGS CONDUCTED BY THE ADJUSTMENT COMMITTEE ON DISCIPLINARY REPORTS

You may ask that witnesses be interviewed and, if necessary, they may be called to testify during your hearing. You may ask that witnesses be questioned along lines you suggest. You must indicate in advance of the hearing the witnesses you wish to be interviewed and specify what they could testify to by filling out the appropriate space on the form, tearing it off, and returning it to the Adjustment Committee. You may have staff assistance if you are unable to prepare a defense. You may request a reasonable extension of time to prepare for your hearing. If you are found guilty of a serious rule violation, you may be placed in confinement and/or segregation, and/or deprived of your current grade and statutory good time or good conduct credit, and/or transferred and/or lose privileges, and/or be required to make restitution. In addition, juveniles may receive a delay in recommended parole.

☒ Committed Person Refused to Sign

_C/M Costello #9441_
PRINT Serving Employee's Name

_C/M Costello #9441_
Serving Employee's Signature

_7/11/05_
Date and Time Served

_APPX 3:15 am/pm_

......(DETACH AND RETURN TO THE ADJUSTMENT COMMITTEE)......

I hereby agree to waive 24-hour notice of charges prior to the disciplinary hearing.

Offense Date: _____

_____
Committed Person's Signature and Number

......(DETACH AND RETURN TO THE ADJUSTMENT COMMITTEE OR PROGRAM UNIT PRIOR TO THE HEARING)......

I would like the Adjustment Committee or Program Unit to consider calling the following witnesses:

NAME OF WITNESS: _____    Number/Cell/Title: _____

Witness can testify to: _____

NAME OF WITNESS: _____    Number/Cell/Title: _____

Witness can testify to: _____

Offense Date: _____

_____
Committed Person's Signature and Number

DC 7255 (Rev. 06/98)    Distribution: 1) Master File; 2) Committed Person; 3) Facility; 4) Facility
IL 426-0361

Deposition of
# Shawn Robinson

Shawn Robinson, #B33802
-vs-
Warden Chambers, etc.

No. 05-2251

July 6, 2007

Reporter: Amy Schuhardt, CSR

Keefe Reporting Company
618-277-0190 or  800-244-0190
Reporter@KeefeReporting.com

```
 1              IN THE UNITED STATES DISTRICT COURT
                  CENTRAL DISTRICT OF ILLINOIS
 2                     URBANA DIVISION

 3

 4   SHAWN ROBINSON, #B33802,        )
                                     )
 5                 Plaintiff,        )
                                     )
 6   vs.                             ) No. 05-2251
                                     )
 7   WARDEN CHAMBERS, OFFICER        )
     D. ATWOOD, OFFICER              )
 8   CUNNINGHAM,                     )
                                     )
 9                 Defendants.       )
                                     )
10                                   )

11

12

13                  Deposition of
                    SHAWN ROBINSON
14          taken on behalf of the Defendants
                  on July 6, 2007.

15

16

17                      INDEX

18   Questions By:               Page:
     Ms. Choate                     4
19

20

21

         Reporter:  Amy Moore Schuhardt, CSR, RPR
22               IL CSR #084-003197
23             Keefe Reporting Company
               11 North 44th Street
24             Belleville, IL  62226
```

1           IN THE UNITED STATES DISTRICT COURT
               CENTRAL DISTRICT OF ILLINOIS
2                    URBANA DIVISION

3

4    SHAWN ROBINSON, #B33802,        )
                                     )
5              Plaintiff,            )
                                     )
6    vs.                             ) No. 05-2251
                                     )
7    WARDEN CHAMBERS, OFFICER        )
     D. ATWOOD, OFFICER              )
8    CUNNINGHAM,                     )
                                     )
9              Defendants.           )

10

11

12

13

14   APPEARANCES:

15     For Plaintiff:       By Shawn Robinson,
                            Pro Se
16
       For Defendants:      ASSISTANT ATTORNEYS GENERAL
17                          By Kelly R. Choate,
                            Attorney at Law
18

19

20

21

22

23

24

1               IT IS STIPULATED AND AGREED by and between

2     counsel for Plaintiff and counsel for Defendants that the

3     deposition of SHAWN ROBINSON may be taken pursuant to the

4     Federal Rules of Civil Procedure, by and on behalf of the

5     Defendants on July 6, 2007, at the offices of Big Muddy

6     Correctional Center, 251 North Illinois Highway 37, Ina,

7     Illinois, before Amy Moore Schuhardt, a Certified

8     Shorthand Reporter and Registered Professional Reporter;

9     that the issuance of notice is waived and that this

10    deposition may be taken with the same force and effect as

11    if all statutory requirements had been complied with.

12               IT IS FURTHER STIPULATED AND AGREED that the

13    signature of the deponent is not waived.

14

15               SHAWN ROBINSON, produced, sworn and examined

16    as a witness on behalf of the Defendants, testified and

17    deposed as follows:

18

19

20

21

22

23

24

3

1                          DIRECT EXAMINATION

2                          BY MS. CHOATE:

3          Q.    Okay.  Could you state your name and spell

4     your last name, please.

5          A.    Shawn Robinson, R-o-b-i-n-s-o-n.

6          Q.    And how old are you, Shawn?

7          A.    34.

8          Q.    Okay.  When did you first come into the

9     Department of Corrections?

10         A.    On this bit or previously?

11         Q.    Just this one.  Did the incident happen

12     during this one or previous?

13         A.    This one.

14         Q.    Okay.  Just start with this one then.

15         A.    Came in '96.

16         Q.    Okay.  Where were you first incarcerated in

17     '96?

18         A.    Pontiac.

19         Q.    Were you just there for R&C or had you

20     stayed for a long time?

21         A.    I stayed there for a while.

22         Q.    How long were you at Pontiac?

23         A.    I'd say approximately two years.

24         Q.    Okay.  Where did you go after that?

4

```
1        A.    Menard.

2        Q.    So from '98 until when were you at Menard?

3        A.    I stayed a while at Menard.

4        Q.    And how long were you at Menard?

5        A.    Excuse me?

6        Q.    How long were you at Menard?

7        A.    I was at Menard about two years.

8        Q.    Two years, also.  And went to Stateville?

9        A.    Yes.

10       Q.    So now we are up to about 2000.  How long

11  were you at Stateville?

12       A.    Approximately two years.

13       Q.    You've got a pattern going here.  After

14  Stateville, where did you go?

15       A.    Illinois River.

16       Q.    And how long were you there?

17       A.    I stayed there probably, approximately six

18  or seven months.

19       Q.    Ruined our streak.  Okay.  After Illinois

20  River, where did you go?

21       A.    Shawnee.

22       Q.    Shawnee.  And how long were you at Shawnee?

23       A.    Let's see, about eight, nine months.

24       Q.    Okay.  And after Shawnee?
```

5

```
 1        A.    I went back to Stateville.

 2        Q.    How long?

 3        A.    For about, about a year, year and a half.

 4        Q.    And then where?

 5        A.    Galesburg.

 6        Q.    And that's Hill?

 7        A.    Yeah.

 8        Q.    How long were you at Galesburg?

 9        A.    I think about two, three months.

10        Q.    You've done quite the tour, haven't you?

11        A.    Yes.

12        Q.    Where did you go after that?

13        A.    Lawrence.

14        Q.    And how long?

15        A.    About 27 months.

16        Q.    Twenty-seven months.

17        A.    Yeah.

18        Q.    And then after Lawrence?

19        A.    Danville.

20        Q.    Danville.  How long were you at Danville?

21        A.    About two and a half years, almost three

22   years.

23        Q.    And then did you come here from Danville?

24        A.    Yes.
```

6

1          Q.    Did everything in your complaint happen

2    where, at Danville?

3          A.    Yes.

4          Q.    So everything happened at Danville?

5          A.    Yes.

6          Q.    Okay.  So why don't you just tell me in your

7    own words, as you know in federal court, there is

8    notice pleading, which means you don't have to give a

9    whole lot of information in your pleading, so I was a

10   little confused as to what order things took place, so

11   just go ahead and start from the beginning, and I

12   realize the warden and Officer Atwood are out of the

13   case, correct?

14         A.    Yes.

15         Q.    Is that your understanding, too?

16         A.    That's my understanding.

17         Q.    Okay.  So I guess they are still a part of

18   what happened, so go ahead and start from the

19   beginning, tell me in your words what happened.

20         A.    Okay.  I was on shower detail, which I start

21   from 9:00 until like 3:30 in the morning.

22         Q.    When was this?

23         A.    It was July the 10th, '05.

24         Q.    '05.  All right.  Go ahead.

1          A.    And I have a routine that I do as far as the

2    days of the week.

3          Q.    Okay.

4          A.    4 House is the houses I do on Sunday, which

5    is where Officer Cunningham is assigned.

6          Q.    Okay.  What shift is he on?

7          A.    3:00 to 11:00.

8          Q.    All right.  Go ahead.

9          A.    This particular day, I go down there, there

10   is another -- my co-worker lives, he lives in that

11   unit, and Officer Cunningham asked me did I have

12   anything unrelated to my job assignment, and I told him

13   no.

14         Q.    What do you mean -- what do you think he

15   meant by did you have anything unrelated to your job

16   assignment?

17         A.    Because previous times I have a book to work

18   with me, to read or --

19         Q.    Oh, so just any property, anything with you?

20         A.    Any property that I'm not supposed to have.

21         Q.    Okay.  And you said no?

22         A.    I told him no.

23         Q.    Okay.

24         A.    And he asked me again, I told him no again,

1    you can shake me down if you want to.  That's when he

2    said okay, and he asked the officer in the bubble, the

3    control officer --

4         Q.    Right.

5         A.    -- to hand him some shake down gloves, and

6    that's when he told me to get up against the glass and

7    put my hands on there.  I started -- as I got up, I put

8    my hands like this, and he told me no, I told you to

9    get up against the glass, and that's when he pushed me.

10        Q.    So you put your hands up, but you weren't

11   leaning against the glass; is that right?

12        A.    No, I was not leaning against the glass.

13        Q.    You weren't leaning against the glass and he

14   wanted you against the glass?

15        A.    Yes.

16        Q.    And so he pushed you against the glass?

17        A.    Yes.

18        Q.    What part of you hit the glass?

19        A.    Dislocated my finger and my elbow.

20        Q.    Left finger, left little finger?

21        A.    Yeah.

22        Q.    Okay.  And your right elbow?

23        A.    Yeah, just to keep myself from hitting my

24   face, caught my balance.

1          Q.    Okay.    Then what happened?

2          A.    That's when I asked Officer Thompson that

3    was in the control room to call Sergeant or Lieutenant

4    and have him zone.    He stated to me that his radios and

5    telephones ain't working, so I left it at that.

6          Q.    What did you do then?

7          A.    I realized that I didn't have the proper

8    cord that goes into the power washer --

9          Q.    Okay.

10         A.    -- which I need to do the shower, sanitation

11   the showers, so he called the administration building

12   and gave me permission to leave and go get it.

13         Q.    Who called the administration building?

14         A.    The officer in the bubble.

15         Q.    Okay.

16         A.    And gave me permission to leave.    When I was

17   leaving, I ran into Sergeant Thompson, which is Officer

18   Thompson's father, and I told him about the incident.

19         Q.    What was -- let's go back to Cunningham.    He

20   pushed you against the glass.    What did he use to push

21   you, one hand, two hands, do you remember?

22         A.    I'm not for sure.

23         Q.    Okay.    And how far away from the glass were

24   you standing when he pushed you against it?

1          A.     I'd say approximately a foot and a half.

2          Q.     So a foot and a half, okay.

3          A.     (Nodding head.)

4          Q.     Did he then shake you down?  Did he pat you

5     down, what did he do?

6          A.     Yes, he shook me down.

7          Q.     Did he find anything?

8          A.     No.

9          Q.     Okay.  And what happened after he shook you

10    down?  What did he do or say to you?

11         A.     Just make smart remarks to me.  I don't know

12    because I was really upset with what had took place, I

13    just ignored him.

14         Q.     Did you say -- you didn't say anything to

15    him then --

16         A.     I didn't say --

17         Q.     -- after you were pushed up against the

18    glass?

19         A.     I didn't say anything to him.

20         Q.     So then you got permission from the bubble

21    officer, CO Thompson, to go get the cord for the power

22    washer, and you ran into his father, who is a sergeant,

23    right?

24         A.     Yes.

1          Q.    And you told him what happened?

2          A.    Yes.

3          Q.    What did Sergeant Thompson say?

4          A.    He notified Lieutenant Cunningham.

5          Q.    Now, is Lieutenant Cunningham not the guy

6    that pushed you against the glass?

7          A.    No, this is Lieutenant.

8          Q.    This is confusing because you've got all of

9    these guys with the same name, all right.  Is

10   Lieutenant Cunningham related to Officer Cunningham?

11         A.    Not to my knowledge.

12         Q.    So Thompson notified Lieutenant Cunningham.

13   All right.  And then what happened?

14         A.    They talked and he took me to get the cord,

15   took me back to R4.  When we got in the building,

16   Officer Cunningham asked me for my identification card.

17         Q.    Was that usual?

18         A.    Excuse me?

19         Q.    Is that the usual routine for them to do?

20         A.    No.

21         Q.    Okay.

22         A.    I didn't understand why, but --

23         Q.    Because he had just seen you?

24         A.    Right.

1          Q.    Okay.  So he asked for your ID card, then

2     what did you do --

3          A.    Yes, I gave it to him, and Sergeant Thompson

4     told me just go do my job, and they called him out of

5     the unit, the warden's office.

6          Q.    So -- okay.  So Thompson was with you.

7     Sergeant Thompson was with you when CO Cunningham asked

8     for your ID card; is that right?

9          A.    Yes.

10          Q.    Okay.  And you then were sent on to do your

11     job?

12          A.    Yes.

13          Q.    And Cunningham was sent to the warden's

14     office?

15          A.    Yes.

16          Q.    All right.  Did you ask any of these people

17     for medical care?  I mean what happened with that?

18          A.    Actually, I asked Thompson.

19          Q.    Sergeant or CO?

20          A.    CO.

21          Q.    Okay.

22          A.    And he called over there and they said he's

23     not -- they have a protocol that they have.  If it's

24     non-emergency, you are not bleeding, not dying, he

13

1    can't come over.

2         Q.    So he did call the healthcare unit for you?

3         A.    Yes, he called.  At this time, at this time

4    of the night, they run insulin line, you know, the

5    insulin dialysis, so I guess they was full, I don't

6    know what it was, but she said I couldn't come over

7    there so --

8         Q.    Okay.  All right.  So you went to do your

9    job?

10        A.    Yes.

11        Q.    Okay.  Then what happened that night,

12   anything else?

13        A.    No.

14        Q.    So you finished your job as usual and went

15   back to your housing unit and everything was --

16        A.    Yes.

17        Q.    What, if anything else, happened after, with

18   you and Cunningham after this?

19        A.    Actually, it wasn't so much that -- it's

20   like when he seen me, you know, he have other officers

21   shake me down, make smart comments to me, you know,

22   about the institution, so what I did, as I still was

23   going to work and everything, every time I go down

24   there, I would let the sergeant or lieutenant know that

1    I'm going down there, you know what I'm saying, and

2    that I was already -- I already had encountered him, I

3    didn't want no problems, would they escort me down

4    there, and that's what they do.

5         Q.    Did that pretty much take care of it then?

6         A.    Basically, basically, because he didn't say

7    nothing else to me.

8         Q.    Yeah.  Because you had other people

9    around --

10        A.    Yeah.

11        Q.    -- knowing you were going down there?

12        A.    Right.

13        Q.    So other than having other people shake you

14   down and making smart comments, did he do anything else

15   to you that's the basis for your lawsuit?

16        A.    No, he didn't do anything else to me.

17        Q.    Okay.  At any time did you see the

18   healthcare unit for these injuries?

19        A.    Well, I didn't have -- I put in a request to

20   the healthcare.

21        Q.    When did you do that?

22        A.    Two days after, two days after because

23   you've got to be on sick call line --

24        Q.    Right.

1          A.      -- to call.  The next thing you know, I was

2    being transferred, I never seen healthcare.

3          Q.      Did you see healthcare when you got to --

4    you went to Danville after this, right?

5          A.      I came here.

6          Q.      You came here.  Did you see healthcare here?

7          A.      No.

8          Q.      Okay.  Why not?

9          A.      Because my finger had already healed, you

10   know what I mean.

11         Q.      What about your elbow?

12         A.      It was all right.

13         Q.      So either, so it really either was it just

14   bruised then, not dislocated?

15         A.      No, it wasn't dislocated.

16         Q.      So you bruised it?

17         A.      Yeah.

18         Q.      And it healed up?

19         A.      Yeah.

20         Q.      But your finger?

21         A.      Was dislocated.

22         Q.      It's still -- can you straighten it out?

23         A.      No, it never straightened out.

24         Q.      Okay.  Did anybody ever look at it and tell

1      you that we'd have to break it again or --

2           A.    Yeah.

3           Q.    -- basically?

4           A.    Yeah, I asked the doctor, I go for asthma

5      clinic --

6           Q.    Right.

7           A.    -- asthma, and he told me that I would have

8      to have it broke so --

9           Q.    Yeah.  What doctor was that, do you

10     remember?

11          A.    No, don't know his name.

12          Q.    Was it here at Big Muddy?

13          A.    Yeah.

14          Q.    All right.  And had you had any problems

15     with Cunningham before this incident against the glass

16     wall or was this just kind of out of the blue with you?

17          A.    I haven't never had any encounters with

18     Officer Cunningham.

19          Q.    So just that one?

20          A.    Yes.  Yes.

21          Q.    Okay.  How soon after this happened were you

22     transferred?

23          A.    I come down here, about two days because

24     I -- it happened on the 10th, I come down here, about

1    30 days.

2         Q.    So first of August sometime?

3          A.    I came down here the first or second week of

4    August, then August the 10th, I come down here, yeah.

5         Q.    I didn't think this would be very long

6    because this is kind of an isolated thing in time, so

7    some guys have like years of stuff.  Everybody they've

8    ever encountered has done something and it takes

9    forever.  I have a question.  How come you waited two

10   days to put in for sick call?  Did you not have the

11   opportunity to do it the day after?  I know 3:00 to

12   11:00 is kind of tough when they are doing insulin

13   line, but how come you didn't do anything the next day?

14        A.    Don't know.

15        Q.    Don't know, okay.  And what did you put in

16   your request slip?  Did you just say I need to see

17   healthcare or did you actually explain what's going on

18   a little?

19        A.    Yeah, you have to explain the injury.

20        Q.    What did you tell them in your sick call

21   slip, do you remember?

22        A.    I can't recall that.  I wanted to see the

23   nurse about my hand.

24        Q.    But it didn't -- you didn't tell them that

18

1    it was like broken or dislocated or anything, did you?

2        A.    No.

3        Q.    Okay.  Because they might not have thought

4    it was an emergency then, right?

5        A.    Right.

6        Q.    Makes sense.  Okay.  Can you think of

7    anything else that you haven't told me about Officer

8    Cunningham, since he's the only defendant left here?

9        A.    It all, it all stemmed from Officer Atwood

10   and I think they knew about it, co-workers and friends

11   and whatnot, because I never had any problem with

12   Cunningham.  I lived in 3 House where Officer

13   Cunningham was first working and I never had a problem

14   with him.

15       Q.    Yeah.

16       A.    So I didn't understand why, you know, he

17   would even come at me like that.

18       Q.    So you think that he came at you because of

19   Atwood?

20       A.    Yes.  See, it all stems from the night that

21   I was in the chow hall when Officer Atwood called me a

22   nigger.

23       Q.    Uh-huh.

24       A.    And I reported him to the shift commander,

1    and he got wrote up or reprimanded, I don't know what

2    happened.   I don't know how they do that with the

3    officers.

4          Q.    Right.

5          A.    But it was like I was, everybody is at me

6    now because I told what he did, you know, so --

7          Q.    Was Officer Cunningham there at the time

8    that Officer Atwood --

9          A.    No.

10          Q.    Was Officer Cunningham there when you

11    reported Officer Atwood?

12          A.    No.

13          Q.    So you are just assuming this happened

14    because they are friends?  Did you ever see them

15    together very much or --

16          A.    Yeah, all the time.

17          Q.    Did you?

18          A.    All the time.  I used to go up to the

19    building and Officer Atwood would be in the bubble with

20    him or be on the wing with him.

21          Q.    Okay.  So you figure since you hadn't had

22    any problems with Cunningham before, that this had to

23    be the cause of it?

24          A.    It had to be.

1        Q.    Okay.  But you don't know for a fact exactly

2    what Cunningham knew about --

3        A.    No.

4        Q.    -- the incident?

5        A.    No.

6        Q.    Okay.  That's fair you weren't there when it

7    all happened so -- okay.  You have the right to review

8    this transcript for errors, and then you can make, you

9    know, corrections if you need to.  So if you want to do

10   that, you can do that, or you can waive that and waive

11   your signature is what it's called, and basically you

12   are trusting her to take down the information

13   correctly.

14       A.    Uh-huh.

15       Q.    But it's up to you.  If you want to buy a

16   copy, you have to contact the court reporter and buy a

17   copy from her, but we would provide you one to look

18   over to make corrections if you want to.

19       A.    Okay.

20       Q.    So you want to do that?

21       A.    Yes.

22             MS. CHOATE:  Okay.  So we'll reserve.

23                  *  *  *  *  *  *  *  *

24

```
 1
 2
 3
 4                    _____
                           SHAWN ROBINSON
 5
 6
     STATE OF _____  )
 7                             )
     COUNTY OF _____  )
 8
 9
10
                  Subscribed and sworn to before me this
11
     _____ day of _____, 2007.
12
13
14
                    _____
15                         NOTARY PUBLIC
16
     My Commission Expires:
17
     AS
18
19
20
21
22
23
24
```

22

1    STATE OF ILLINOIS    )

                          )  SS

2    COUNTY OF ST. CLAIR )

3              I, Amy Moore Schuhardt, a Notary Public in

4    and for the County of St. Clair, State of Illinois, DO

5    HEREBY CERTIFY that pursuant to agreement between counsel

6    there appeared before me on July 6, 2007, at the offices

7    of Big Muddy Correctional Center, 251 North Illinois

8    Highway 37, Ina, Illinois, SHAWN ROBINSON, who was first

9    duly sworn by me to tell the whole truth of all knowledge

10   touching upon the matter in controversy aforesaid so far

11   as the witness should be interrogated concerning the

12   same; that the witness was examined and said examination

13   was taken down in shorthand by me and afterwards

14   transcribed upon the typewriter, being signed by the

15   deponent, signature having not been waived by agreement

16   of counsel, and said deposition is herewith returned.

17             IN WITNESS WHEREOF, I have hereunto set my

18   hand and affixed my Notarial Seal this 9th day of

19   July, 2007.

20

21            *Amy Moore Schuhardt*

       "OFFICIAL SEAL"
       Amy Moore Schuhardt
       Notary Public, State of Illinois
       My Commission Exp. 08/22/2009

22            Notary Public, CSR, RPR

       My Commission Expires August 22, 2009.

23            IL CSR #084-003197

24